J-S28032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: J.A.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M.L. AND T.C., | : | |
| PARENTS | : | No. 486 MDA 2025 |

Appeal from the Decree Entered March 10, 2025
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9607

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED SEPTEMBER 08, 2025**

Appellants, D.M.L. ("Mother") and T.C. ("Father") (collectively, "Parents"), appeal from the decree entered in the Luzerne County Court of Common Pleas, Orphans' Court, which granted the petition filed by Children and Youth Services ("CYS") for involuntary termination of Parents' parental rights to their minor child, J.A.L. ("Child") (born October 2022).  We affirm.

The relevant facts and procedural history of this matter are as follows. In October 2022, Child was placed in care immediately following his birth and hospital discharge due to the placement of a sibling, Mother's lack of progress with services, and continuing contact with Father despite domestic violence concerns.[1]  On December 15, 2022, the court adjudicated Child dependent. On December 22, 2022, Child was returned to Mother's custody with the

_____

[1] Father was incarcerated from September 20, 2022, for a probation violation on a simple assault charge in which Mother was the victim.  He was released in December 2022.

requirement that Father's visitation be supervised by CYS, due to the history of domestic violence between Parents.

On April 24, 2023, Child was placed in foster care a second time. Mother had been avoiding caseworkers and stated that her aunt had passed away. However, CYS later discovered that Parents had been residing together at an alternate address which Mother had not provided to CYS, in violation of the court order. During that time, there was an incident of mutual domestic violence between Parents; caseworkers discovered Father leaving the home, and he was arrested on an active warrant.

In March 2024, CYS again discovered Father at Mother's home, this time hiding in the basement after Mother pocket-dialed her caseworker and Father's voice could be heard on the phone. When CYS arrived, Mother claimed Father was not in the house. After Father was found, Parents claimed that Child had gotten locked in a car, and Father had been helping to get him out.

On May 6, 2024, CYS filed a petition for the involuntary termination of Father's parental rights. On May 9, 2024, CYS filed an amended petition regarding Father. On May 21, 2024, CYS filed an "amended" petition for the involuntary termination of Mother's parental rights.[2]

---

[2] Despite the petition's title, CYS had never filed an original termination petition regarding Mother. CYS additionally filed goal change petitions on the dependency docket, but Parents do not challenge these determinations on appeal.

The court held an evidentiary hearing on the termination petitions on August 29, 2024, November 22, 2024, December 20, 2024, and January 27, 2025. During the hearings, the court heard the testimony of Dr. Michael Church, who performed a psychological evaluation of Mother; Cindy Jones, a CYS caseworker; Samira Almonte, a Catholic Social Services caseworker; Jade Levi, Child's court-appointed special advocate;[3] Tiffany Shotwell, Father's brother's fiancée and Mother's roommate, as well as the testimony of Mother and Father.

Dr. Michael Church testified that he is a licensed clinical psychologist who performed an independent psychological evaluation of Mother on August 7, 2023. She had a care plan developed in September 2021, but no intake assessment until almost a year later. Mother did not receive care from 2022 until August 2023. Dr. Church determined that Mother had an extensive history of chronic psychological issues, likely due to her traumatic background. Mother had significant challenges in verbal comprehension and perceptual reasoning, and an overall IQ estimate of 79, or in the 8th percentile. Dr. Church diagnosed Mother with generalized anxiety disorder, paranoid, dependent, and impulse-control personality disturbances, and a language disorder. Mother also informed Dr. Church that CYS had "mess[ed] up" her

---

[3] Originally, Maria Turetsky, Esq., served as both legal counsel and guardian *ad litem* for Child. The court determined that there was no conflict of interest in this dual role. (**See** N.T. Hearing, 8/29/24, at 4; 11/22/24, at 9). Additionally, it appears that Jade Levi was court-appointed to act as Child's advocate in December 2022. (**See** N.T. Hearing, 12/20/24, at 81).

life and she wanted the "abuse" to stop, which he interpreted as externalizing blame for her circumstances. (N.T. Hearing, 8/29/24, at 20-21).

As a result of the aforementioned factors, Mother did not have the ability to live independently. Dr. Church recommended Mother engage in psychotherapy, social and occupational activities, and vocational or educational training, as well as consult with a psychiatrist and consider the resumption of psychiatric medication. Although he acknowledged Mother's capacity to be a loving parent, Dr. Church opined that Mother's conditions could only improve with dedicated participation in treatment, and that her personality disturbances were significantly more difficult to treat than anxiety. If left untreated, the disturbances could impair her ability to parent safely.

Cindy Jones, a caseworker for CYS, testified that she has been involved with Child since his birth and that she has worked with Parents regarding their other children. She testified that Child was placed in care shortly after his hospital discharge, due to Mother's failure to participate in services in the case of a sibling, as well as domestic violence concerns with Father. Child was returned to Mother's custody under the condition that Father be permitted only supervised visitation. Mother was ordered to engage in a psychological evaluation and parenting education. At that time, Father had done nothing to address the agency's domestic violence concerns.

Ms. Jones further testified that in April 2023, Mother became evasive, saying that she was visiting a sick aunt who she later claimed had passed away. However, this was a lie, and Mother was staying in the home of a third

party, R.S., together with Father and Child, unsupervised. Child was placed in foster care and Mother's visits were returned to supervised. Father was not engaged in any services at that time.

On May 15, 2023, the court entered a finding of aggravated circumstances regarding Mother because her parental rights to Child's sibling were involuntarily terminated and, as a result, CYS was relieved of providing services on March 13, 2024, after this Court affirmed that termination decision. Prior to that time, CYS had attempted to make the appropriate referrals to services, provide supervised visitation, and casework counseling. Mother ultimately completed parenting education and obtained employment at Panera Bread and stable housing, but her trauma counseling was ongoing.

Ms. Jones also testified regarding the extensive history of domestic violence between Parents. They engaged in a mutual incident at the home of R.S., and Father had previously bit Mother in the parking lot of Geisinger Hospital. Father punched Mother in the stomach while she was pregnant, reportedly leading to the termination of that pregnancy, and threatened to urinate on Mother's deceased son's grave. Father repeatedly strangled Mother to the point where she could not breathe. As of the date of the termination hearing, Father had not completed any domestic violence services with CYS. Despite this history and court orders, Parents continued to associate.

Ms. Jones opined that Mother was not able to provide Child with necessary parental care due to her poor decision-making, impulse control, and tendency to get herself into dangerous situations. Ms. Jones felt that Mother

would continue to engage in these same behaviors if Child was returned to her. Mother seemed to prioritize her relationship with Father over Child's safety and well-being, including the incident in March 2024 where Mother was provided unsupervised visitation and caseworkers discovered Father at the residence, hiding in the basement. Ms. Jones offered several other examples of Mother's poor judgment and instability, including but not limited to the fact that Mother was behind on rent and faced eviction, had put an unsecured box fan in a window where Child could reach it, and had nine animals living in a two-bedroom apartment.[4]

Regarding Father's compliance with the family service plan, CYS requested that Father complete an assessment. As of the date of the termination hearing, Father had not done so despite Ms. Jones' efforts to contact him. Father had not been cooperative meeting with Ms. Jones and even fled on a bicycle when she attempted a home visit. Father was permitted supervised visitation but did not attend visits until after being served with the termination petition. Father never communicated with Child or provided gifts, food, or clothing during the pendency of the case. Further, on June 15, 2023, there was a finding of aggravated circumstances after Father's parental rights to Child's sibling were terminated. At that time, CYS was no longer required to provide services to Father. Prior to that point, Ms. Jones repeatedly attempted to reach out by letter, phone, and text to Father to determine what

---

[4] Later in the termination hearing, Mother testified that at that time she only possessed two dogs.

services were needed, but he did not respond.

Ms. Jones summarized Father's involvement as a failure to engage in any requested services, failure to maintain contact with CYS, and failure to visit with Child on a regular basis, and possessing a long history of domestic violence and violating court orders regarding Child and his contact with Child. Father lacked judgment and impulse control and repeatedly placed his own needs ahead of Child's needs. In Ms. Jones' opinion, Father is unable to provide Child with essential parental care, and termination of his parental rights would best serve Child's needs and welfare.

Ms. Jones testified that Child is placed with foster parents with three biological siblings and is doing well in placement. Child has a parent/child bond with his foster parents. Child has a comfortable and friendly bond with Mother, and he calls her "Mom." (N.T. Hearing, 1/25/25, at 13). Ms. Jones testified that Child and Father have a "connection" but did not characterize it as a bond. (*See id.* at 16). Regardless, Ms. Jones opined that Child's needs and welfare would be best served by termination.

Samira Almonte, a caseworker employed by Catholic Social Services, testified that she has been observing Father's visits with Child since August 6, 2024. She testified that Father and Child have a "genuine connection" and that Father plays with Child and changes his diapers. (N.T. Hearing, 12/20/24, at 71). Since beginning visits in August, Father has attended consistently with only some missed visits due to illness. (*See id.* at 72). Ms. Almonte also observed Mother's visits with Child and stated that Child and Mother share a

bond, which is stronger than the bond with Father. (***See id.*** at 77).

Jade Levi, a court-appointed advocate for Child, testified that she observed both parents interacting with Child. Child has parental bonds with both parents, particularly with Mother, but also has a parental bond with his foster parents. She opined that it was in Child's best interests for Father's parental rights to be terminated, due to the lack of parental involvement prior to the filing of the termination petition. Ms. Levi stated that Father claimed he could not get in touch with Ms. Jones, but Ms. Jones asserted that she was communicating with Father and Father would not come in for the assessment. Further, Ms. Levi testified that she would recommend termination of Mother's parental rights, due to a recent police incident she had been made aware of in which Mother was seriously injured, and which had resulted in an ongoing court case. Ms. Levi was concerned for Child's safety had he been present.

Mother testified that she has eight children, four with Father. She has been participating in trauma counseling, completed parenting courses, and has a service dog. She has been diagnosed with "bipolar schizophrenia, depression, and bipolar" but does not take medication for these illnesses other than medical marijuana. (N.T. Hearing, 11/22/24, at 69). She is employed at Panera Bread, makes $14 an hour, and her hours per week vary. Mother denied that Child ever slept in the room with the box fan. Mother denied a continuing romantic relationship with Father and denied that Father stays at her home. She stated that she had withdrawn her protection from abuse order against him and was proud of him for improving himself. When questioned

on cross-examination, Mother stated she did not know why Father had listed her current address as his own on a recent criminal docket. Mother admitted that she has pending criminal charges following a physical altercation that took place near her residence. Mother testified that she has a bond with Child and he cries when she leaves the room.

Father testified that he resides with his father and is employed part-time at AutoZone. Father was incarcerated at the time of Child's birth, and he claimed that Ms. Jones visited him in jail but did not bring an assessment form. Father stated that he enrolled in and completed anger management courses through his probation office. He was again incarcerated from March 2023 until June 2023. Father testified that his bond with Child is "great" and that he tries to teach Child how to do things. (N.T. Hearing, 1/25/25, at 51).

Tiffany Shotwell testified that she is engaged to Father's brother and is familiar with the family. In her opinion, Mother and Child have a strong bond, and Mother is a competent parent. She testified that she observed Father taking care of Child during a visit, but she did not testify regarding any bond between Father and Child.

On March 10, 2025, the court found that CYS met its burden by clear and convincing evidence to terminate Parents' parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b), and entered decrees terminating their parental rights. On April 2, 2025, Mother, through court-appointed counsel, timely filed a notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) statement. On April 9, 2025, Mother and Father retained the services of

private counsel and filed a joint a notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) statement.[5]

On appeal, Parents raise the following issues for review:

> 1. Did the trial court abuse its discretion or commit an error of law in involuntarily terminating the parental rights of both natural parents where it appears from a review of the record that such determination was not supported by clear and convincing evidence under the adoption act, 23 Pa.C.S.A. § 2511 (a)?
>
> 2. Did the trial court fail to review the evidence in the light most favorable to the Appellant natural Mother and Father and grant the Appellants the benefit of all reasonable inferences, in determining whether the evidence was sufficient to sustain the court's conclusions by a clear and convincing evidence?
>
> 3. Did the trial court commit reversible error when it [involuntarily] terminated the natural Mother and Father's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the Minor Child as required by the adoption act, 23 Pa.C.S.A. § 2511(b)?
>
> 4. Did the trial court commit reversible error in failing to find that the evidence established that the natural Mother and Father demonstrated a genuine interest and sincere, persistent and unrelenting effort to maintain a parent-child relationship with Minor Child, but that their efforts were thwarted by the obstructive behavior on the part of third parties?

---

[5] On April 17, 2025, Mother withdrew her first appeal, which had been docketed at No. 463 MDA 2025. The appeal was marked discontinued that same day.

(Parents' Brief at 4-5).[6]

In their issues combined, Parents assert that CYS did not establish adequate grounds for the involuntary termination of their parental rights. Parents contend that they have never given up their attempts to enforce their parental rights to Child. Rather, they assert that they were deliberately thwarted in their attempts by third parties. In Father's case, he points to his incarceration following Child's birth and Mother's protection from abuse order. In both Parents' cases, they argue that CYS prevented them from reuniting with Child and that the agency has unclean hands and should not be allowed to use the "court system" to deny Parents access to Child and then claim that Parents have abandoned Child. (Parents' Brief at 26-27). Parents argue that they both have strong bonds with Child, and that it is not in Child's best interest for their rights to be terminated. Parents assert that while a finding of parental unfitness is a prerequisite for the termination of parental rights, it does not necessitate that those rights be terminated. According to Parents, they have a genuine connection with Child and there are no safety concerns for Child while he is with Parents. Parents conclude that CYS failed to provide

_____

[6] Parents' disorganized brief, despite containing four identified issues, does not contain separate sections for each issue set forth in their statement of questions presented, with distinctive headings for each section, in violation of Pa.R.A.P. 2119. We caution Parents that failure to conform with the Pennsylvania Rules of Appellate Procedure may result in the quashal or dismissal of appeal. *See In re Ullman*, 995 A.2d 1207, 1211-12 (Pa.Super. 2010), *appeal denied*, 610 Pa. 600, 20 A.3d 489 (2011) (some internal citations omitted). *See also* Pa.R.A.P. 2114-2119 (addressing specific requirements of each subsection of appellate brief). Nevertheless, because we may discern the nature of Parents' claims, we decline to quash the appeal.

clear and convincing evidence to prove termination was warranted under Section 2511(a) and (b), and this Court must grant relief.[7]  We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> > Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. ... We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> > *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> > Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be

_____

[7] We also note that Parents' brief does not specifically address the fact that the court terminated their rights under Section 2511(a)(2), and much of their argument appears to address Section 2511(a)(1) (stating: "The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties"). Parents' failure to support their argument with relevant legal authority is an additional violation of the Rules of Appellate Procedure.  *See* Pa.R.A.P. 2119(a) (explaining argument shall be followed by discussion and citation of authorities as are deemed pertinent).

resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

***In re Adoption of A.C.H.***, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. ***In re J.D.W.M.***, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

***In re Z.P., supra*** at 1115-16 (quoting ***In re Adoption of K.J.***, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

The Orphans' Court granted involuntary termination of Parents' parental rights to Child on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117. When conducting a termination analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of ... his parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re Z.P., supra* at 1117. "Parents are required to make diligent efforts towards the

- 14 -

reasonably prompt assumption of full parental responsibilities." *Id.* at 1117-18. Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"[I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2)[.]" *In re Adoption of S.P.*, 616 Pa. 309, 328-29, 47 A.3d 817, 828 (2012). "Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind ... that the child's need for consistent parental care and stability cannot be put aside or put on hold[.]" *Interest of K.M.W.*, 238 A.3d 465, 474 (Pa.Super. 2020) (*en banc*) (quoting *In re E.A.P.*, 944 A.2d 79, 84 (Pa.Super. 2008)).

> The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted). "Importantly, a parent's 'recent efforts to straighten out [his] life' upon release from incarceration does not require that a court 'indefinitely postpone adoption.'" *Interest of K.M.W., supra* at 474 (quoting *In re Z.P., supra* at 1125).

- 15 -

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

Further, our Supreme Court has clarified that, in making a Section 2511(b) determination, a trial court must analyze: (1) whether the parental bond is "necessary and beneficial to the child;" (2) "the child's need for permanency and length of time in foster care;" (3) "whether the child is in a pre-adoptive home and bonded with foster parents;" and (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability." *Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023). Moreover, the Court explained that, when reviewing the nature of the parental bond, a

- 16 -

court must consider "whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* Importantly, the *K.T.* Court's decision is particularly relevant to an analysis of an existing parental-bond. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

Instantly, the court explained its decisions regarding Section 2511(a)(2)'s application to Mother as follows:

> Based upon the testimony of various witnesses .... this [c]ourt finds that subsequent to the second placement of the child on April 24, 2023, Mother continued to require ongoing therapy and did not benefit from parenting education. Despite a court order in place forbidding Father from having unsupervised contact with the child, Mother chose to disregard the Court order, fabricated a story regarding her aunt's death, presumably to enable Father to be with the child unsupervised. The child was already removed from Mother's care once, yet she again disregarded the court's directive, resulting in the child being removed a second time after her deception was discovered by Ms. Jones. By prioritizing her own interests over the child's safety and well-being, Mother demonstrated an incapacity to protect her child.
>
> To date, Mother has yet to address her own mental health issues or benefit from mental health treatment and parenting education. Therefore, the [c]ourt finds that as of the date of hearing, Mother has not been able to remedy the conditions which gave rise to the placement of the child.

(Orphans' Cout Opinion, 5/23/25, at 18).

With regard to Father,

> Ms. Jones expressed serious concerns about Father's ability to safely parent the child, citing his lack of engagement, poor communication with the agency, failure to visit the child prior to the termination petition, history of domestic violence, and repeated violations of the court's orders. She concluded that Father exhibited poor judgment and consistently prioritized his own needs over the child's well-being. Therefore, this [c]ourt finds that due to Father's refusal to complete the court ordered services as directed and to follow the court's orders, Father has not remedied the issues which resulted in the child's placement .... The overwhelming evidence clearly demonstrates that Mother and Father have not fully engaged in the court ordered services nor had they benefitted from the services that they completed. At this juncture, the child's right to have proper parenting in fulfillment of [his] potential in a permanent, healthy, safe environment outweighs the natural parents' interest.

(Orphans' Court Opinion, 5/23/25, at 26-27) (some citations omitted).

The record supports the court's determination that Parents' repeated and continued incapacity or refusal caused Child to be without essential parental care, and that the conditions leading to the incapacity have not been remedied by Parents. Although Parents argue that "third parties" prevented them from visiting with Child, the testimony of Ms. Jones established that Parents had not complied with the family service plans or conditions for reunification and that Mother had repeatedly lied to caseworkers regarding her contact and interactions with Father. Further, although Father points to his incarceration as an impediment towards the completion of his goals, there was no evidence that he utilized prison resources to attempt to maintain a relationship with Child. *See In re B., N.M., supra*. The court decided that

Ms. Jones' testimony was more credible than that of Parents, and we see no reason to disrupt the court's credibility findings. *See In re Z.P., supra*. Therefore, the court correctly determined that the parental incapacity still existed and had not been remedied by Parents. *See id.*

Regarding Section 2511(b), the court pointed to testimony that Child is strongly bonded and well-integrated with his foster family and has a secure and loving parent-child bond, where his physical, developmental, medical, and emotional needs are all met. The court acknowledged bonds between Parents and Child, but characterized them as "playmate" bonds rather than parent-child bonds. (*See* Orphans' Court Opinion at 30-31). The court observed:

> At the time of the hearing, both parents had supervised visitation. Mother previously progressed to unsupervised and overnight visits, but was unable to maintain that status, leading to a return to supervised visits. Ms. Jones also observed healthy sibling interactions during her visits. The foster parents help maintain contact with the Child's other siblings who are placed in other foster homes.
>
> Ms. Jones testified that she discussed the potential for post-adoption contact with the biological parents, but the foster parents were not agreeable to that arrangement. Mother testified that she no longer fears for her safety around father and believes he has changed for the better.

(Orphans' Court Opinion at 32-33). The court acknowledged Ms. Shotwell's testimony that Mother was a fit and loving caregiver who met Child's needs, and that Father provided appropriate parental care, but the court found Ms. Jones' testimony more credible than that of Parents and Ms. Shotwell. Thus, the court concluded that the termination of Parents' parental rights was in

Child's best interests.

The record supports the court's conclusion that foster parents provide the love, comfort, security, and stability that Child needs, and that termination of Parents' parental rights is in Child's best interests. *See In re C.P., supra*. Consequently, we affirm the decrees terminating Parents' parental rights to Child.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 09/08/2025